UNITED STATES of America,

v.

Jose MUYET, John Muyet, Pedro Narvaez, Julio Matias, William Delvalle, Frank Sosa, and Antonio Feliciano, Defendants.

S3 95 Cr. 941 (PKL).

United States District Court, S.D. New York.

Dec. 3, 1996.

Mary Jo White, United States Attorney for the Southern District of New York (Jay Holtmeier, Thomas M. Finnegan, of counsel), New York City, for U.S.

Roy R. Kulcsar, New York City, for Jose Muyet.

Golub & Golub, L.L.P. (Mitchell A. Golub, of counsel), New York City, for John Muyet.

Robert L. Weinstein, New York City, for Pedro Narvaez.

Hoffman & Pollok (Susan C. Wolfe, of counsel), New York City, for Julio Matias.

Barocas & Schmidt (Sam A. Schmidt, of counsel), New York City, for William Delvalle.

Sanford M. Katz, New York City, for Frank Sosa.

Freeman, Nooter & Ginsberg (Lee A. Ginsberg, of counsel), New York City, for Antonio Feliciano.

### *OPINION AND ORDER*

LEISURE, District Judge:

Julio Matias and Pedro Narvaez are charged in connection with an alleged narcotics trafficking organization. They are each charged with participating in a criminal enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a); with conspiring to participate in a criminal enterprise in violation of RICO, 18 U.S.C. § 1962(d); with committing violent crimes in aid of racketeering in violation of 18 U.S.C. § 1959(a); with conspiring to violate the narcotics laws of the United States in violation of 21 U.S.C. § 846; and with using and carrying firearms in violation of 18 U.S.C. § 924(c).

Julio Matias moves to suppress all evidence derived from a June 3, 1992 automobile search. Pedro Narvaez moves to suppress all evidence obtained during a different automobile search that occurred on June 3, 1992 and all evidence derived from a March 31, 1994 automobile search. The Court conducted a suppression hearing on November 1, 1996. Each of the parties filed post-hearing briefs. For the reasons set forth below, the motions are denied.

## I. THE JUNE 3, 1992 AUTOMOBILE STOP INVOLVING JULIO MATIAS

At the suppression hearing, Officer Richard Capria testified on behalf of the Government regarding the events surrounding the June 3, 1992 automobile stop that is the subject of Matias's motion. The Court makes the following findings of fact.

### A. Findings of Fact

On June 3, 1992, Officer Richard Capria and Sergeant Glavey[1] were parked in a marked police cruiser near 896 Melrose Avenue between East 161st Street and East

---

1. The record does not indicate Sergeant Glavey's first name.

163rd Street in the Bronx, New York. Tr. at 60–61.[2] At about 12:40 a.m., Officer Capria observed a car making a right hand turn from 163rd Street onto Melrose Avenue heading south. *Id.* The car was moving too quickly as it rounded the corner, and the driver lost control. . *Id.* at 61. As a result, one of the hubcaps flew off the car; the tires made a loud screech; and the car came to a halt positioned diagonally across both lanes, with the front of the car blocking the oncoming traffic lane. *Id.*

Officer Capria responded by pulling the police cruiser in front of the car to block its path. *Id.* He then exited the cruiser with his gun drawn and approached the driver's side of the car, while Sergeant Glavey approached the passenger side of the car. *Id.* at 62. As Officer Capria approached the car, he observed Juan Machin seated in the driver's seat, Julio Rivera seated in the passenger seat, and the defendant, Julio Matias, seated in the rear of the car. *Id.* When Officer Capria asked the three occupants what they were doing, they failed to reply. *Id.* at 63. He then asked them whose car it was. *Id.* Machin responded that they had just found the car. *Id.* at 63–64. Officer Capria called for police backup and instructed the occupants to keep their hands in view. *Id.* at 64. When additional police officers arrived at the scene, the occupants were taken out of the car and handcuffed. *Id.* Officer Capria proceeded to search the occupants and found several live rounds of 9–millimeter ammunition in Machin's pocket. *Id.* at 65. After searching the individuals, he proceeded to search the car and seized additional rounds of ammunition from a case that was on the front seat. *Id.* The police officers then searched the trunk of the car and seized additional ammunition, a loaded 9–millimeter handgun and a loaded MAC–11 gun. *Id.*

\*　　\*　　\*

Julio Matias filed the instant motion on September 20, 1996. The Government argued that Matias was not entitled to an evidentiary hearing on the motion. The Government opposed the motion on the ground that as a mere passenger, Matias lacks standing to challenge the search of the automobile. At oral argument on October 18, 1996, the Court held that Matias was entitled to an evidentiary hearing because, although he may lack standing to challenge the *search,* he has standing to challenge the *stop* of the car. Matias argues that the stop was unlawful because it was not supported by reasonable suspicion that criminal activity was afoot.

### B.  Standing

The threshold issue on a Fourth Amendment claim is whether the defendant has standing to seek the suppression of the seized evidence.[3] The resolution of this issue depends upon whether the defendant had a reasonable expectation of privacy in the area searched. *See Rakas,* 439 U.S. at 148–49, 99 S.Ct. at 432–33; *United States v. Perea,* 986 F.2d 633, 639 (2d Cir.1993) ("In support of a motion to suppress evidence found in a warrantless search, the defendant must show that he had a reasonable expectation of privacy in the place or object searched."). In most cases, a mere passenger in a car lacks standing to challenge a search of the vehicle because he does not have a reasonable expectation of privacy in the automobile. *See, e.g., Rakas,* 439 U.S. at 148–49, 99 S.Ct. at 432–33; *United States v. Paulino,* 850 F.2d 93, 97 (2d Cir.1988), *cert. denied,* 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989).

The question of standing to challenge a stop of a car presents different issues from that of standing to challenge a subsequent search. *United States v. McKneely,* 6 F.3d 1447, 1450 (10th Cir.1993); *cf. Rakas,* 439 U.S. at 150–51, 99 S.Ct. at 434 (Powell, J., concurring) (noting that the Court's decision

**2.** Citations in this form are to the transcript of the suppression hearing conducted on November 1, 1996.

**3.** Although the Supreme Court in *Rakas v. Illinois,* 439 U.S. 128, 138–40, 99 S.Ct. 421, 427–29, 58 L.Ed.2d 387 (1978), discouraged use of the

term "standing," this Court uses the term as shorthand when discussing whether the defendant's Fourth Amendment interests were implicated by the challenged Government action. *See United States v. Kimball,* 25 F.3d 1, 5 n. 1 (1st Cir.1994).

was limited to the issue of whether the passengers had a legitimate expectation of privacy invaded by the search of the vehicle, not the stop thereof). Even if a passenger lacks standing to challenge a search, he may have standing to challenge a seizure of an automobile. *See McKneely,* 6 F.3d at 1450; *United States v. Roberson,* 6 F.3d 1088, 1091 (5th Cir.1993), *cert. denied,* 510 U.S. 1204, 114 S.Ct. 1322, 127 L.Ed.2d 671 (1994); *United States v. Clark,* 822 F.Supp. 990, 1004 (W.D.N.Y.1993); *see also United States v. Rusher,* 966 F.2d 868, 874 n. 4 (4th Cir.) (passengers lack standing to challenge search of vehicle but can challenge seizure of their own persons), *cert. denied,* 506 U.S. 926, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992); *United States v. Portwood,* 857 F.2d 1221, 1222 (8th Cir.1988) (passenger who was searched had standing to challenge legality of stop and search), *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2073, 104 L.Ed.2d 638 (1989).

■ An automobile stop results in a seizure of the car and the passengers alike. *Kimball,* 25 F.3d at 5; *Roberson,* 6 F.3d at 1091; *see United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 678–79, 83 L.Ed.2d 604 (1985) (noting that stopping car and detaining its occupants constitutes seizure under the Fourth Amendment); *Berkemer v. McCarty,* 468 U.S. 420, 436, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984) (noting that "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle"); *Colorado v. Bannister,* 449 U.S. 1, 4 n. 3, 101 S.Ct. 42, 43–44 n. 3, 66 L.Ed.2d 1 (1980) (per curiam) ("There can be no question that the stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment."); *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660 (1979) ("[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth Amendments], even though the purpose of the stop is limited and the resulting detention quite brief."). Therefore, a passenger has standing to challenge an automobile stop as unconstitutional. *See United States v. Eylicio–Montoya,* 70 F.3d 1158, 1164 (10th Cir.1995); *Kimball,* 25 F.3d at 5; *McKneely,* 6 F.3d at 1450; *Rober-*

*son,* 6 F.3d at 1091; *Clark,* 822 F.Supp. at 1005; *see also United States v. Powell,* 929 F.2d 1190, 1195 (7th Cir.) (noting that several courts have concluded that passengers have standing to challenge vehicle stops), *cert. denied,* 502 U.S. 981, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991); *United States v. Brewer,* 947 F.2d 404, 411 (9th Cir.1991) (remanding to district court to determine whether passenger has standing to challenge stop). If an initial stop of an automobile was illegal, evidence seized in a subsequent search may well be excludable as fruit of the poisonous tree. *See Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963); *Kimball,* 25 F.3d at 5–6; *McKneely,* 6 F.3d at 1450. Accordingly, Matias has standing, as a passenger, to challenge the stop of the automobile. Because Matias only has standing to challenge the stop of the automobile, his motion must be denied if the stop was lawful.

### C. The Stop

A traffic stop is a limited seizure within the meaning of the Fourth and Fourteenth Amendments. *See Whren v. United States,* —— U.S. ——, ——, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996); *United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994). Therefore, a traffic stop must be reasonable. *See Whren,* —— U.S. at ——, 116 S.Ct. at 1772. In other words, it must be justified by either probable cause or reasonable suspicion, based on specific and articulable facts, that the individual was engaged in unlawful activity. *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968); *Scopo,* 19 F.3d at 781. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren,* —— U.S. at —— 116 S.Ct. at 1772 (citing *Prouse,* 440 U.S. at 659, 99 S.Ct. at 1399; *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 332–33, 54 L.Ed.2d 331 (1977) (per curiam)); *see Scopo,* 19 F.3d at 782 ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." (quoting *United States v. Cum-*

*mins,* 920 F.2d 498, 500 (8th Cir.1990), *cert. denied,* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991) (internal quotation marks omitted))).

▮ In the present case, Officer Capria observed Machin commit a traffic violation by driving recklessly.[4] *See* N.Y. Veh. & Traf. Law § 1212 (McKinney Supp.1996). This observation gave Officer Capria probable cause to stop Machin. *See Whren,* —— U.S. at ——, 116 S.Ct. at 1772; *Scopo,* 19 F.3d at 782. Therefore, the automobile stop was lawful.[5] Because Matias only has standing to challenge the stop, his motion is denied.[6]

## II. THE JUNE 3, 1992 AUTOMOBILE SEARCH INVOLVING PEDRO NARVAEZ

At the suppression hearing, Officer Jean–Michael Akey testified for the Government regarding the events surrounding the June 3, 1992 automobile search that is the subject of Narvaez's motion. The Court makes the following findings of fact.

### A. Findings of Fact

On June 3, 1992, Officer Jean–Michael Akey was on patrol with his partner, Officer Thomas Kelly. Tr. at 5. At 2:09 a.m., they received a radio alert regarding three Hispanic males with guns in the vicinity of East 194th Street and Decatur Avenue in the Bronx, New York. *Id.* The officers responded to that location within minutes and obtained a similar report from a witness named Jose Rivera, who stated that three Hispanic males driving a burgundy minivan had pointed a gun at him. *Id.* at 5–6, 12, 16–17. The officers then departed in search of the suspects. *Id.* at 6. Shortly thereafter, they received a radio report from another police unit advising them that a burgundy minivan had been spotted parked on or about the next block, at Marion Avenue and East 195th Street. *Id.* at 6, 41. They responded to that location and observed a minivan parked in front of 2665 Marion Avenue with the engine running. *Id.* at 6. There were two people in the van, Pedro Narvaez, an Hispanic male, and Marilyn Torres, an Hispanic female. *Id.* at 7, 19. Narvaez, the driver, was in lawful possession of the van. Narvaez Aff. ¶ 9.

Officer Akey parked his police cruiser in the street ahead of the minivan in a position which prevented it from pulling around his vehicle. Tr. at 20–21. Two or more additional police units arrived at or about the same time as officers Akey and Kelly. *Id.* at 22. Officer Akey and his partner approached the van with their guns drawn. *Id.* at 6–7, 21. As Officer Akey approached Narvaez, another officer called out that there was a

---

4. Machin argues in his supplemental brief that the Court should carefully scrutinize Officer Capria's testimony at the suppression hearing due to his inability to recall certain details regarding the events surrounding the stop. The Court has done so, and finds that Officer Capria's testimony regarding the traffic violation is credible and trustworthy.

5. The defendant makes note of the fact that Officer Capria did not issue, nor intend to issue, a summons for the traffic infraction. Given that the officers recovered guns and ammunition, and concluded that none of the occupants were authorized to drive the car, the fact that Officer Capria did not issue a traffic citation is unremarkable. Moreover, his subjective intentions are irrelevant to the probable cause inquiry and do not affect the constitutional reasonableness of the traffic stop. *Whren,* —— U.S. at ——, 116 S.Ct. at 1774.

6. Even if Matias could challenge the subsequent search, it was a lawful search incident to arrest.

*See, e.g., Scopo,* 19 F.3d at 782. Having observed a traffic violation, Officer Capria was authorized to arrest Machin. *See* N.Y. Veh. & Traf. Law § 155 (McKinney 1986 & Supp.1996) ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."); N.Y.Crim.Proc.Law § 140.10(1)(a) (McKinney 1992) ("[A] police officer may arrest a person for ... [a]ny offense when he has reasonable cause to believe that such person has committed such offense in his presence...."); *see also People v. Cortes,* 86 Misc.2d 155, 158, 382 N.Y.S.2d 445, 447 (1976) (a police officer may arrest a person for a traffic violation committed in the officer's presence). Once an officer has probable cause to make an arrest, he is entitled to search the suspect and his "grab space" in the car. *Scopo,* 19 F.3d at 782 (citing *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981)). Accordingly, the search was also lawful.

gun in the back of the van. *Id.* at 7–8.[7] Officer Akey ordered Narvaez out of the vehicle, frisked him and proceeded to handcuff him. *Id.* at 8. Officer Akey then walked around to the back of the van and saw a gun sitting on top of a large speaker in the rear of the van. *Id.* at 8–9. He entered the van through the sliding side door of the van and recovered a 9–millimeter handgun. *Id.* at 9, 34–35. No other officer entered the van before Officer Akey. *Id.* at 41. After returning to the station, the officers searched Narvaez and recovered a 9–millimeter round of ammunition from his pants' pocket. *Id.* at 10.

\* \* \*

Narvaez argues that the officers' initial approach of his van was illegal because it was not based on reasonable suspicion that criminal activity was afoot. He also argues that the ensuing warrantless search was illegal because the Government has failed to establish that the search was within one of the exceptions to the Fourth Amendment's warrant requirement.

## B. The Initial Approach

The Court's analysis begins with the preliminary issue of whether the police officers' initial approach of the parked van constituted a seizure within the meaning of the Fourth Amendment. A seizure has occurred when, under the circumstances surrounding the police-citizen encounter, a reasonable person would have believed that he was not free to terminate the encounter. *See Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991); *United States v. Peterson,* 100 F.3d 7, 10–11 (2d Cir.1996) (quoting *Gardiner v. Incorporated Village of Endicott,* 50 F.3d 151, 155 (2d Cir.1995)); *United States v. Glover,* 957 F.2d 1004, 1008

(2d Cir.1992); *United States v. Springer,* 946 F.2d 1012, 1016 (2d Cir.1991). In determining whether a seizure has occurred, a court should consider all of the circumstances surrounding the encounter, including the threatening presence of several police officers and the display of a weapon. *See Glover,* 957 F.2d at 1008 (quoting *United States v. Lee,* 916 F.2d 814, 819 (2d Cir.1990)).

■ In the present case, the circumstances surrounding the initial police approach of the van would communicate to a reasonable person that he was not free to terminate the encounter. Officer Akey parked his police cruiser in front of Narvaez's van in a manner that prevented him from driving away from the area. Several police officers were present at the scene. Furthermore, Officers Akey and Kelly approached the van with their guns drawn. Based on these circumstances, the Court concludes that Narvaez was seized within the meaning of the Fourth Amendment.

Having concluded that the initial approach constituted a seizure, the Court must now decide whether the seizure was reasonable. To justify an investigative stop, an officer must point to specific articulable facts which gave rise to reasonable suspicion that the individual was engaged in criminal activity. *See Terry,* 392 U.S. at 21, 88 S.Ct. at 1879–80; *Peterson,* 100 F.3d at 10–11; *United States v. Alexander,* 907 F.2d 269, 272 (2d Cir.1990), *cert. denied,* 498 U.S. 1095, 111 S.Ct. 983, 112 L.Ed.2d 1067 (1991). Reasonable suspicion depends upon the content of the information possessed by the officer and its degree of reliability. *United States v. Bold,* 19 F.3d 99, 102 (2d Cir.1994); *United States v. Walker,* 7 F.3d 26, 29 (2d Cir.1993), *cert. denied,* 510 U.S. 1169, 114 S.Ct. 1201, 127 L.Ed.2d 549 (1994). In determining

**7.** Officer Akey testified before a grand jury that he was having a conversation with Narvaez when he noticed a gun on the top of a speaker in the back of the van. Tr. at 26. (quoting grand jury testimony). He did not state that he heard another officer say there was a gun in the car. Officer Akey explained that he omitted this fact when testifying before the grand jury because the district attorney did not ask him what, if anything, his fellow officers said as he approached the van. *Id.* at 29. In contrast, at the suppression hearing, the Assistant United States Attorney

asked him specifically, "As you approached the driver's side, what if anything did you hear from other officers?" *Id.* at 7. Having observed Officer Akey's demeanor, considered his present testimony, and compared it to his grand jury testimony, the Court finds his present testimony to be credible and trustworthy, and attributes his prior omission to the fact that the district attorney asked questions more generally worded than those asked by the Assistant United States Attorney.

whether information possessed by an officer provided a sufficient basis for an investigatory stop, a court should consider the totality of the circumstances. *United States v. Salazar*, 945 F.2d 47, 50 (2d Cir.1991) (citing *Alabama v. White*, 496 U.S. 325, 328, 110 S.Ct. 2412, 2415, 110 L.Ed.2d 301 (1990); *United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981)), *cert. denied*, 504 U.S. 923, 112 S.Ct. 1975, 118 L.Ed.2d 574 (1992).

The case of *United States v. Bold*, is instructive. In *Bold*, the police responded to a radio call based on an anonymous tip that three black males, one armed with a gun, were in a four-door gray Cadillac parked in the parking lot of a White Castle restaurant at the corner of Pennsylvania and Wortman Avenues in Brooklyn, New York. The officers proceeded to the scene and observed a gray Cadillac parked in the back of the lot. One officer approached the car and his suspicion was aroused by the car's darkly tinted windows. He opened the door and observed two black men in the front seat. He then directed the occupants to step out of the car. As the passenger exited the car, money fell out from under his shirt. The officer then patted down the suspect. Another officer patted down the driver. The officers then searched the car. Inside the car, they recovered more money and a toy gun. One of the officers remembered hearing about a bank robbery earlier in the day. They radioed for a description of the bank robber. The passenger matched the description of the bank robber. Additionally, the officers learned that the robber had worn a tweed coat and carried a briefcase, two items that the officers had located during their search of the car. The defendants were subsequently indicted for bank robbery.

The district court suppressed the evidence found in the car, holding that the anonymous tip did not support a finding of reasonable suspicion. The Court of Appeals for the Second Circuit reversed, holding that, based on the tip that the suspect was armed, the officers' independent corroboration of the tipster's information, the unusual location of the car, and the inability of the officers to see into the darkly tinted car windows, the police officers had reasonable suspicion to stop the car, open the car door and order the occupants to exit the car for questioning. The Second Circuit emphasized the importance of the fact that the tip related to a man with a gun.

> Where the tip concerns an individual with a gun, the totality-of-the-circumstances test for determining reasonable suspicion should include the possibility of the possession of a gun, and the government's need for a prompt investigation. "The unique dangers presented to law enforcement officers and law-abiding citizens by firearms are well chronicled." An officer who is able to corroborate other information in an anonymous tip that another person is in actual possession of a gun is faced with an "unappealing choice." He must either stop and search the individual, or wait until the individual brandishes or uses the gun.

*Bold*, 19 F.3d at 104 (citations omitted).

■ Based on the holding in *Bold*, this Court finds that the officers had reasonable suspicion that justified the limited seizure which occurred in this case. Much like the officers in *Bold*, the officers in this case needed to investigate promptly because the information concerned an individual with a gun. The facts in this case created an even greater necessity for decisive action. The suspect in *Bold* was merely accused of possessing a gun, whereas the suspect in the present case allegedly threatened the informant with a gun.

Faced with the risk of an armed suspect, the officers were certainly authorized to stop the van and ask questions of Narvaez. The officers were acting on information obtained from Jose Rivera, a face-to-face informant. Information obtained from a face-to-face informant is more reliable than information provided by an anonymous informant. *See Bold*, 19 F.3d at 102 (citing *Salazar*, 945 F.2d at 50–51). Although the tip was not as detailed as the one provided in *Bold*, and there were not three Hispanic males in the van as Rivera had indicated, the officers were still justified in stopping the minivan to question Narvaez. The vehicle, a burgundy minivan,

matched the informant's description. Furthermore, the officers located the van shortly after speaking to Rivera in close proximity to the area where the alleged assault occurred. When the officers approached the van, the engine was still running. It was entirely conceivable, at the time the officers approached the van, that the other suspects were actually hiding in the minivan or had recently exited the van. These facts, taken together, provided the officers with the reasonable suspicion necessary to stop the vehicle and question the occupants. The officers acted well within their authority in taking steps to dispel or confirm their suspicion.

This conclusion is further supported by the fact that the limited seizure was reasonable in relation to the circumstances which justified the initial stop. *See Terry*, 392 U.S. at 20, 88 S.Ct. at 1879. A lesser level of suspicion is required to justify a less intrusive stop. *See United States v. Pelusio*, 725 F.2d 161, 165 (2d Cir.1983) ("The longer and more intrusive the stop, the stronger must be the justification for it."). Based on their initial level of suspicion, the officers merely stopped and approached the van. They did not order Narvaez out of the van or subject him to a protective frisk until after they saw the gun. The fact that the officers drew their guns does not render the stop unreasonable. *See Alexander*, 907 F.2d at 272 ("A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists."); *United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir.1984).

## C. The Search

Although the initial approach of the van was lawful, the Government must still demonstrate that the evidence was lawfully obtained. A defendant seeking to suppress evidence found in a warrantless search bears the initial burden of showing that he had a reasonable expectation of privacy in the place searched. *Perea*, 986 F.2d at 639. As the driver in lawful possession of the minivan, Narvaez had a reasonable expectation of privacy in the van. *See United States v. Ochs*, 595 F.2d 1247, 1253 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

■ Once the defendant has satisfied his burden, the Government must show that the search was within one of the exceptions to the warrant requirement. *See Perea*, 986 F.2d at 639. These exceptions include the "plain view" exception and the search incident to arrest exception. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971); *see Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983). Under the plain view doctrine, an officer may seize evidence in plain view if the initial intrusion was permissible, the discovery of the evidence was inadvertent, and the incriminating nature of the evidence was immediately apparent. *United States v. Scopo*, 19 F.3d 777, 782–83 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994). An essential predicate to this doctrine is that the initial intrusion was lawful; in other words, the officer was authorized to be in the area where he saw the evidence. *See United States v. George*, 975 F.2d 72, 78 (2d Cir.1992).

■ The Court has already concluded that the officers were authorized to approach the van. As they approached the minivan, one of the officers saw a firearm in plain view through the window of the minivan. The presence of the firearm was highly and immediately incriminating under the circumstances. Therefore, under the plain view doctrine, the officers could seize the gun without a search warrant. Furthermore, once the officers observed the gun, they had probable cause to arrest Narvaez and conduct a search incident to that arrest. *See, e.g., Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969). Accordingly, the ammunition seized during that search was lawfully obtained. Based on the foregoing, Narvaez's motion to suppress the evidence recovered from the June 3, 1992 search is denied.

## III. THE MARCH 31, 1994 AUTOMO- BILE SEARCH INVOLVING PE- DRO NARVAEZ

At the suppression hearing, Officers Christopher Jones and Salvatore Abiuso testified for the Government regarding the events surrounding the March 31, 1994 automobile search that is the subject of Narvaez's motion. Narvaez testified on his own behalf, but the Court struck his testimony when he refused to answer questions on cross-examination. The Court allowed the defendant to submit a supplemental affidavit in support of his motion. The Court considered the testimony of the officers and Narvaez's Supplemental Affidavit in making the following findings of fact.

### A. Facts

On March 31, 1994, Officers Christopher Jones, Salvatore Abiuso and William Cuff were on patrol heading northbound on Jerome Avenue in the Bronx, New York. Tr. at 42–43, 127. Traffic conditions were heavy in both directions. Id. at 44, 99, 127. At about 5:30 p.m., the officers noticed a Honda slowly pass by them in the southbound lane. Id. at 43–44, 127–28. As it passed, Officer Jones, who was seated in the rear of the police cruiser, observed Jose Muyet, the front seat passenger in the Honda, holding a clear plastic cup. Id. at 44, 91, 97; see Narvaez Supplemental Aff. ¶ 4 ("While I was driving, Jose Muyet was drinking what I believed to be an alcoholic beverage from a clear plastic cup."). Officer Jones made eye contact with Muyet who curled his lip into a smirk and made a toasting motion with the cup toward Jones. Tr. at 44–45. Officer Abiuso, who was seated in the passenger seat of the cruiser, observed the front seat passenger in the Honda pour what appeared to be champagne from a bottle into a plastic cup

held by the driver.[8] Id. at 127, 148–149. He also observed one of the men in the automobile make a toasting motion toward him, but he could not recall which of them did so. Id. at 128.

Based on these observations, the officers concluded that the suspects were drinking alcohol. Id. at 97, 128. Officer Cuff, the driver of the police cruiser, made a U-turn in order to pursue the suspects. Id. at 47, 99, 128. Narvaez pulled over to the side of the road and parked front first in a driveway near an auto body store on Jerome Avenue. Id. at 47, 99, 128, 150; Narvaez Supplemental Aff. ¶ 6. As Officer Cuff parked the police car at the curb of the driveway behind the Honda, the suspects exited the car, left the doors ajar and attempted to walk away in opposite directions. Tr. at 48, 102–04.

Officer Jones approached Muyet about ten feet away from the car and questioned him about the drinking. Id. at 48–49, 103, 107, 129–30, 136. Muyet pointed to the car and stated that they had been celebrating and drinking some Moet. Id. at 49, 108. Officer Jones subsequently issued a citation to Muyet for drinking an alcoholic beverage. Id. at 116. Officer Abiuso saw Muyet motion toward the car and overheard him state that he had just celebrated the birth of his friend's baby, drank champagne, and left the bottle in the car. Id. at 130, 136. After Muyet's statements, Officer Abiuso entered the car through the open front door, and searched the front of the vehicle for a champagne bottle. Id. at 136. He then directed his attention to the back seat of the car and saw an open canvas bag containing what appeared to be glassine bags of heroin partially wrapped in torn, brown paper. Id. at 137. At that point, he ordered his fellow officers to handcuff Narvaez and Muyet. Id. at 50,

---

**8.** Officer Abiuso could not remember which defendant was seated in the driver's seat and which one was seated in the passenger seat. However, he did remember that the passenger poured what appeared to be champagne into a cup held by the driver. Tr. at 147–149. It is undisputed that Narvaez was the driver. Narvaez Supplemental Aff. ¶ 4.

Officer Abiuso did not relate this observation when he testified before a grand jury because

when he testified before the grand jury, he was only questioned about the events that occurred after the stop of the car, and he made this observation before the stop of the car. Tr. at 149. Having observed Officer Abiuso's demeanor, considered his present testimony, and compared it to his grand jury testimony, the Court finds his present testimony on this point to be credible and trustworthy.

137.[9]

While transporting the defendants to the local police precinct, Officer Cuff told Narvaez that they were going to conduct an inventory search of the car when it arrived at the station. *Id.* at 53. Narvaez was the lawful owner of the car. Narvaez Aff. ¶ 15; Narvaez Supplemental Aff. ¶ 3. Without administering *Miranda* warnings, Officer Cuff asked Narvaez if there was anything else in the car. Tr. at 53, 117–119. Narvaez confessed that there was a gun underneath the back seat of the car.[10] *Id.* at 53. After arriving at the police station, Officer Jones retrieved a gun, ammunition and additional glassine bags of heroin from under the back seat of the car. *Id.* at 54. He secured these items and then returned to conduct a full inventory search of the automobile. *Id.* at 54–55. The police officers also searched the defendants at the precinct, and recovered several thousand dollars in cash. *Id.* at 55–56.

\* \* \*

Narvaez argues that the initial search at the scene of the automobile stop was illegal because the Government has failed to establish that the search was within one of the exceptions to the Fourth Amendment's warrant requirement. He also argues that the evidence recovered from under the back seat of the car was derived from his unwarned statement and should therefore be suppressed as fruit of the poisonous tree.

## B. The Initial Search

As the owner and driver of the Honda, Narvaez had a reasonable expectation of privacy in the car, so the Government must show that the search was within one of the exceptions to the warrant requirement. *See Perea,* 986 F.2d at 639; *Ochs,* 595 F.2d at 1253. When a police officer makes "a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile. It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment...." *Belton,* 453 U.S. at 460, 101 S.Ct. at 2864 (footnotes omitted). The search incident to arrest exception is justified by the need to ensure that the arrestee does not have the opportunity to obtain a weapon or destroy evidence. *See id.* at 457, 101 S.Ct. at 2862–63; *Chimel,* 395 U.S. at 763, 89 S.Ct. at 2040; *Perea,* 986 F.2d at 643.

▮ In the present case, the arrest of Muyet and Narvaez was lawful. Based on their own observations, and Muyet's statement that he and Narvaez had been drinking in the car,[11] the officers had probable cause

---

**9.** The facts recited in Narvaez's Supplemental Affidavit conflict with the testimony of the officers. The Court has considered the testimony of the officers, compared it with Narvaez's Supplemental Affidavit, and considered Narvaez's motives to misstate the facts. On balance, the Court credits the testimony of the two police officers, whose testimony was consistent in all material respects. Most importantly, each officer testified that he personally observed one of the occupants of the vehicle make a toasting motion, and that he heard Muyet state, in sum and substance, that there was drinking going on in the car. Narvaez, who is facing significant jail time if convicted, has a strong motive to misstate the facts. Accordingly, the Court finds that his affidavit is not credible.

The Court notes that the substance of Narvaez's Supplemental Affidavit is substantially similar to the substance of Narvaez's testimony on direct examination at the suppression hearing. Thus, even if the Court had allowed his testimony to stand, the Court would have made the same findings of fact.

**10.** The Government concedes that this unwarned statement was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**11.** Narvaez urges the Court to discredit Officer Jones's testimony regarding Muyet's statement because, he contends, it conflicts with Officer Abiuso's grand jury testimony in the following manner. Officer Jones testified that Muyet stated that *they* had been celebrating and drinking some Moet. Tr. at 49. Officer Abiuso testified before a grand jury on May 2, 1994 that he heard Muyet state, "*I* had just celebrated, *I* celebrated the birth of my friend's baby and *I* drank champagne and the bottle is in the car." *Id.* at 136 (quoting grand jury testimony) (internal quotation marks omitted) (emphasis added). Thus, Narvaez argues, it is unclear whether Muyet indicated that Narvaez had also been drinking. The Court finds the testimony of both officers to be credible. Neither officer quoted Muyet verbatim during their respective testimony. They merely testified to the sum and substance of what Muyet said. The Court need not make a finding with

to believe Narvaez and Muyet had each committed a traffic violation by drinking an alcoholic beverage in a motor vehicle being driven on a public highway. *See* N.Y. Veh. & Traf. Law § 1227 (McKinney 1986). Therefore, the police officers were authorized to arrest the suspects. *See Scopo*, 19 F.3d at 781.

Because the arrest was lawful, the subsequent search was also lawful as a search incident to an arrest. *See Belton*, 453 U.S. at 460, 101 S.Ct. at 2864. Narvaez argues that the search was not "incident" to the arrest because the passenger compartment of the car was not reasonably within reach of the arrestees at the time that they were arrested. The defendant relies on the fact that at the time of Muyet's admission, Muyet was at least ten feet away from the car. Therefore, he argues, the rationale for the application of the exception is not present. The facts in *Belton* undermine defendant's argument. In *Belton*, the police officers directed the suspects out of the car, placed them under arrest, and "split them up into four separate areas of the Thruway" before searching the car. *Id.* at 456, 101 S.Ct. at 2862 (internal quotation mark omitted). Despite the fact that the suspects had been separated from the car, the Court held that the search was a lawful search incident to arrest. *Id.* at 462–63, 101 S.Ct. at 2865–66. Thus, the fact that Muyet was ten feet away from the car when the officers conducted the search does not render the search unreasonable. Several courts have considered and rejected arguments similar to the one advanced by defendant. *See, e.g. United States v. Snook*, 88 F.3d 605, 608 (8th Cir.1996) (search of car lawful even though arrestee handcuffed, put in back seat of police cruiser and driven away from scene prior to search); *United States v. Lacey*, 86 F.3d 956, 971 (10th Cir.) (search of van lawful even though arrestee removed from van, handcuffed, placed on ground and door of van closed prior to search), *cert. denied*, —— U.S. ——, 117 S.Ct. 331, 136 L.Ed.2d 244 (1996); *United States v. Mitchell*, 82 F.3d 146, 152 (7th Cir.) (search of van

lawful even though arrestee handcuffed and placed in police vehicle prior to search), *cert. denied*, —— U.S. ——, 117 S.Ct. 155, 136 L.Ed.2d 100 (1996); *United States v. Moorehead*, 57 F.3d 875, 878 (9th Cir.1995) (search of car lawful even though arrestee placed in back seat of police vehicle prior to search); *United States v. Doward*, 41 F.3d 789, 793 (1st Cir.1994) (search of car lawful even though arrestee handcuffed and placed in police vehicle prior to search), *cert. denied*, —— U.S. ——, 115 S.Ct. 1716, 131 L.Ed.2d 575 (1995).

Nevertheless, it is true that in some cases, an arrestee may be so far away from the vehicle searched by the officers, that the rationale for the exception breaks down, and the search can not be said to be "incident" to the arrest. *See Perea*, 986 F.2d at 643 (citing *United States v. Lasanta*, 978 F.2d 1300, 1305 (2d Cir.1992)). In *Lasanta*, ·the defendant was in his house asleep when the investigating agents knocked on his door to arrest him. He had not recently been driving the car and was not standing next to it. The agents arrested him at the doorstep of his house while his car was parked in his driveway. Under these circumstances, the Second Circuit noted that "[t]he substantial distance between the site of Cardona's arrest and the vehicle in the driveway forecloses any question of the agents' need to search the vehicle for weapons to ensure their safety during the arrest." 978 F.2d at 1305. The present case is a far cry from *Lasanta*. The police officers had just recently observed the defendants engaging in what appeared to be unlawful conduct. The defendants quickly parked and exited their car. Muyet admitted that he had been drinking in the car and that there was a bottle of champagne in the car, only ten feet away. Muyet was not handcuffed or otherwise restrained at the time. Under these circumstances, the officers were authorized to search the passenger compartment of the car and the canvas bag sitting in the back seat. *See Belton*, 453 U.S. at 460, 101 S.Ct. at 2864.

respect to the exact words used by Muyet because the sum and substance of his statement, coupled with the officers' observations provided the requisite probable cause to arrest both Muyet

and Narvaez. Even if the officers only had probable cause to arrest Muyet, they were still authorized to search the car incident to Muyet's arrest.

## C. The Search Following the Unwarned Statement

Although the officers obtained the unwarned statement from Narvaez in violation of *Miranda*, the evidence derived from that statement is admissible under the inevitable discovery doctrine. This doctrine allows the Government to introduce illegally obtained evidence if it "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984); *see United States v. Cabassa*, 62 F.3d 470, 472 (2d Cir.1995); *United States v. Griffiths*, 47 F.3d 74, 77 (2d Cir.1995). "The exception requires the district court to determine, viewing the affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *Cabassa*, 62 F.3d at 473 (quoting *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993), *cert. denied*, 510 U.S. 1045, 114 S.Ct. 693, 126 L.Ed.2d 660 (1994)). Thus, the Court must determine: (1) whether the evidence would have inevitably been discovered and (2) whether such discovery would have been lawful.

■ In light of the fact that the police found a large quantity of what appeared to be heroin in the car, they surely would have searched the car for additional contraband even if Narvaez had not made the unwarned statement. This conclusion is well supported by the record. Before Narvaez made the statement, Officer Cuff informed him that he and his fellow officers intended to voucher the car and conduct an inventory search at the station. Officer Jones testified that, in conducting an inventory search, he would have searched underneath the back seat of the car. Therefore, the police would have discovered the gun, ammunition and additional glassine bags of heroin under the back seat of the car even if Narvaez had not made the unwarned statement.

The evidence would have been legally obtained under the automobile exception to the warrant requirement.[12] Law enforcement officers may conduct a full, warrantless search of an automobile if they have probable cause to believe that the automobile contains contraband. *See California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991); *United States v. Harwood*, 998 F.2d 91, 96 (2d Cir.), *cert. denied*, 510 U.S. 971, 114 S.Ct. 456, 126 L.Ed.2d 388 (1993). Once the police officers discovered the large number of bags containing a substance that appeared to be heroin in the car, they had probable cause to believe that the car contained contraband. At that point, they were authorized to conduct a full search of the automobile. The fact that the police conducted the search at the police precinct rather than at the scene of the arrest is irrelevant. *See United States v. Johns*, 469 U.S. 478, 484, 105 S.Ct. 881, 885, 83 L.Ed.2d 890 (1985); *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 3080–81, 73 L.Ed.2d 750 (1982) (per curiam) ("[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody...."); *Texas v. White*, 423 U.S. 67, 68, 96 S.Ct. 304, 305, 46 L.Ed.2d 209 (1975) (per curiam); *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981–82, 26

12. The Government argues that this discovery would have been lawful under the inventory search exception to the warrant requirement. Under this exception, police officers may inventory a suspect's car regardless of whether they have probable cause to believe that the car contains contraband. The inventory exception is justified by the need to "protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987). Police officers may only inventory a suspect's belongings pursuant to "established inventory procedures." *See Griffiths*, 47 F.3d at 78 (quoting *Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S.Ct. 2605, 2611, 77 L.Ed.2d 65 (1983)) (internal quotation marks omitted). The existence of such procedures may be established by reference to written rules or by police testimony regarding standard practices. *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir.1994). Because the Government failed to introduce sufficient evidence to prove the existence of standardized inventory procedures, the Court can not hold that the evidence would have been legally obtained under the inventory exception.

L.Ed.2d 419 (1970); *Harwood,* 998 F.2d at 97. Accordingly, the evidence derived from the unwarned statement is admissible under the inevitable discovery doctrine. Based on the foregoing analysis, Narvaez's motion to suppress the evidence obtained from the March 31, 1994 automobile search is denied.

## CONCLUSION

For the reasons stated above, Julio Matias's motion to suppress is DENIED. Pedro Narvaez's motion to suppress evidence obtained from the June 2, 1992 automobile search is DENIED. Pedro Narvaez's motion to suppress evidence obtained from the March 31, 1994 automobile search is DENIED.

**SO ORDERED.**