**UNITED STATES of America,**

v.

**David CAMPBELL, Defendant.**

**Nos. 96–CR–0050A, 96–CR–50A(H).**

United States District Court,
W.D. New York.

March 18, 1997.

Patrick H. Nemoyer, United States Attorney (Joseph M. Guerra, III, Assistant United States Attorney, of counsel) Buffalo, NY, for the Government.

Kimberly A. Schechter, Assistant Federal Public Defender, Buffalo, NY, for Defendant.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Carol E. Heckman, pursuant to 28 U.S.C. § 636(b)(1), on April 10, 1996. On April 26, 1996, defendant filed a motion to suppress evidence seized as a result of searches conducted on March 20 and March 22, 1 996. Defendant filed an amended motion to suppress on June 18, 1996.

On October 30, 1 996, Magistrate Judge Heckman filed a Report and Recommendation, recommending that defendant's motion be denied.

Objections to the Magistrate Judge's Report and Recommendation were submitted by defendant to be filed under seal. The government submitted a response thereto to be filed under seal and defendant submitted a reply to the government's response. Oral argument on the objections was held on February 19, 1997.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Heckman's Report and Recommendation, defendant's motion for suppression of evidence is denied.

The parties shall appear before this Court on Thursday, March 20, 1997 at 9:00 a.m. for a meeting to set trial date.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

HECKMAN, United States Magistrate Judge.

This matter was referred to the undersigned by the Hon. Richard J. Arcara, to hear and report, in accordance with 28 U.S.C. § 636(b). Defendant has moved to suppress evidence seized as a result of searches conducted on March 20 and March 22, 1 996. An evidentiary hearing was held before the undersigned on July 1 7, 1996, and oral argument on the suppression motion was heard by the undersigned on September 25, 1 996. For the following reasons, defendant's motion should be denied.

### BACKGROUND

Buffalo Police Department Detective Daniel Rinaldo and Chautauqua County Sheriff's Investigator Michael Johnson were the only witnesses who testified at the suppression hearing.

### 1. *The Testimony of Detective Rinaldo.*

Detective Rinaldo testified that he has been a Buffalo police officer for 13 years and is currently assigned to the Drug Enforcement Agency (DEA) Task Force. On March 20, 1996, at approximately 12:30 p.m., Rinaldo received a telephone call at the Buffalo DEA office. The call was from a woman who wished to remain anonymous. She informed Rinaldo that she had information about an individual who was currently in possession of several ("about seven") kilograms of cocaine. Rinaldo made arrangements to meet with the woman, referred to herein as the "confidential informant," later that afternoon at a resi-

dential address in the City of Buffalo (Tr. 51–52).[1]

At approximately 3:30 p.m. that afternoon, Rinaldo and DEA Special Agent Gene Nanna drove to the prearranged location. At Rinaldo's direction, there were several other officers in the vicinity. Eventually the confidential informant came out of the residence and got into Rinaldo's vehicle. She told Rinaldo and Nanna that she was involved in a personal relationship with an individual named David Campbell, who was a "multikilo distributor of cocaine" (Tr. 54). She had recently caught him with another woman (Tr. 55).

The confidential informant gave Rinaldo and Nana a detailed description of the individual and his activities. She told them that Campbell was a Jamaican national with long dreadlocks, 5' 8" to 5' 10" tall, weighing about 160 lbs. He owned a late 1980's model Buick. He had recently returned from New York City where he had purchased seven kilograms of cocaine. He was currently storing the cocaine at a residence on Meyers Street. On the previous day she had assisted Campbell while he "cooked up" 1 2 ounces of cocaine at the Meyers Street residence. She also informed the officers that Campbell was currently on parole for a felony narcotics conviction in New York State, and that his brother owned a store named "Dr. Bird's" on East Delevan Street in Buffalo (Tr. 53–56).

The confidential informant told the officers that Campbell currently had possession of three firearms, one of which was a handgun that he carried with him at all times. She advised the officers that Campbell would not hesitate to use the handgun on her for providing information to the police. She also told them that Campbell would not hesitate to use the weapon on a police officer who stopped him on the street. She also provided addresses for three "stash houses" where Campbell allegedly stored cocaine (Tr. 57–58).

Rinaldo drove the confidential information to one of the stash house locations, and then to the Meyers Street address, to see if a car

1. References preceded by "Tr." are to page numbers of the transcript of the July 17, 1996 suppression hearing.

matching the description given by the confidential informant could be located. At the Meyers Street address, Rinaldo observed a late 1980's model Buick parked in the driveway. The confidential informant identified the Buick as the car used by Campbell to travel between New York City and Buffalo. Rinaldo transmitted the license plate number to Special Agent William Cookfair of the Immigration and Naturalization Service ("INS") to run a registration check. Agent Cookfair informed Rinaldo over the radio that the car was registered to David Campbell at a Miller Street residence. Cookfair also stated that he recognized Campbell's name from a 1987 narcotics investigation, and that Dr. Bird's Store on East Delevan Street had been the site of several narcotics raids. Rinaldo further testified that he received information over the radio from other officers who were conducting surveillance at the Meyers Street location that they had also had previous contact with a Jamaican man with dreadlocks named David Campbell, involving narcotics and firearms (Tr. 58–62). Rinaldo was unable to provide a time frame for this reported prior contact (Tr. 61–62).

The confidential informant also provided the officers with a detailed description of locations inside the Meyers Street residence where drugs and weapons were kept (Tr. 62–63). She provided Agent Nanna with a telephone number for the residence. Nanna dialed the number on a cellular telephone and handed the phone to the confidential informant. She had a conversation with an individual in the residence. When the conversation ended she told the officers that it was "Dave." He was home, and he was "busy" (Tr. 63–65).

Rinaldo then took the confidential informant to a schoolyard at Fillmore Avenue and Best Street where she got into a car occupied by other officers (Tr. 91). Rinaldo testified that he instructed the other officers to maintain surveillance of the Meyers Street address while he and Nanna made arrangements with the U.S. Attorney's office to obtain search warrants (Tr. 65–66).

At approximately 4:42 p.m., Rinaldo received a radio call from one of the officers on surveillance advising that an individual had been observed leaving the Meyers Street residence and entering the Buick that was parked in the driveway. The Buick backed out of the driveway and proceeded southbound on Meyers Street. Rinaldo instructed the surveilling officers to follow the vehicle closely until a location could be found where the vehicle could be pulled over safely and detained. He and Nanna left the schoolyard and joined a "caravan" of other officers in pursuit of the vehicle (Tr. 66–67).

Rinaldo testified that he received a radio call from Task Force Agent Thomas Gerace advising that he had pulled alongside the vehicle and observed that it was being driven by an individual who met the description provided by the confidential informant. Rinaldo observed Gerace pull his vehicle in front of the Buick. The Buick then pulled over to the curb at 792 Genesee Street. Gerace's vehicle was in front of the Buick, and a vehicle driven by Investigator Johnson stopped alongside the Buick. Rinaldo observed the officers leave their vehicles and approach the Buick (Tr. 67–69)

## 2. The Testimony of Investigator Johnson.

Investigator Johnson testified that on March 20, 1996, he was maintaining surveillance of the Meyers Street area from his vehicle positioned on Best Street. At approximately 4:40 p.m., Johnson observed the Buick pull out of the driveway onto Meyers Street and proceed south toward Genesee Street. Johnson followed the vehicle as it proceeded down Meyers Street and turned right onto Genesee. As he was following the Buick, Johnson received the information transmitted by Agent Gerace that the driver matched the description received from the confidential informant. Johnson observed the Buick pull over to the curb in front of a fish market at 792 Genesee Street. Johnson pulled his vehicle alongside the Buick. He observed defendant in the driver's seat, and a woman in the passenger's seat (Tr. 8–11).

Johnson testified that he exited his vehicle with his weapon drawn and approached the Buick. He yelled to defendant to raise his hands and exit the vehicle. Defendant raised his left hand, but did not raise his right hand.

He turned his back toward Johnson and slumped down. Johnson opened the car door, grabbed defendant's left arm and attempted to pull him out of the vehicle, but defendant resisted him. He told defendant to raise his right arm, but again defendant did not comply. Johnson holstered his weapon and with both hands pulled defendant out of the Buick "facedown onto the roadway" (Tr. 10–15).

Johnson testified that once defendant was placed on the ground, Agent Gerace grabbed defendant's right arm and pulled it out from under his stomach. Gerace then yelled "gun" several times loudly. The officers handcuffed defendant behind his back, and Gerace removed a loaded Taurus nine-millimeter semiautomatic pistol from the front of defendant's pants. Johnson then stood defendant up against the back of the Buick and frisked him. Johnson found four clear plastic bags containing what he identified as crack cocaine in defendant's left breast shirt pocket. Defendant was then placed under arrest (Tr. 15–19).

On March 20, 1996, following defendant's arrest, a search warrant was obtained for the Buick and the Meyers Street residence. Upon execution of the warrants, agents found a black knapsack in the rear seat of the Buick containing quantities of a white substance that field-tested positive for cocaine. Also found inside the knapsack were a small quantity of marijuana and an electronic digital scale (*see* Item 1). The search of the Meyers Street residence revealed a quantity of rubber gloves, two 9–millimeter bullets, a box of plastic sandwich bags, a sifter and miscellaneous paper work (*see* Item 14).

On March 22, 1996, an additional search warrant was obtained for a safe recovered from the residence of an associate of defendant. Inside the safe was found a 9–millimeter pistol, a 25–caliber pistol, boxes of ammunition, and $25,026 in U.S. currency (*see* Item 14).

### DISCUSSION

Defendant moves to suppress all of this evidence. Both parties agree that once the gun was found, defendant was properly arrested and the discovery of the crack cocaine in defendant's pocket was valid as a search incident to the arrest. The suppression motion turns, therefore, on whether the encounter on Genesee Street was an "investigatory stop" requiring reasonable suspicion, or an "arrest" requiring probable cause, to justify the warrantless search and seizure.

According to defendant, he was under arrest as soon as the agents approached him on Genesee Street, and the agents lacked probable cause for the arrest. Defendant therefore argues that all of the evidence obtained as a result of the arrest and the search warrants should be suppressed as "fruits" of the unjustified seizure and search of his person.

The government argues that the initial stop of the defendant and the frisk conducted by Johnson and Gerace were part of an investigatory stop based on reasonable suspicion of criminal activity. In the alternative, the government argues that the agents had probable cause to stop and seize the defendant.

### 1. *Investigatory Stop v. De Facto Arrest*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." Generally, an individual is considered to have been "seized" within the meaning of the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). As the Supreme Court stated in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991):

> We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, the court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not

free to decline the officers' requests or otherwise terminate the encounter.

501 U.S. at 439, 111 S.Ct. at 2389.

As the Second Circuit has recognized, there are two categories of "seizures" of the person implicating the protection of the Fourth Amendment. *Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir.1991); *United States v. Hooper,* 935 F.2d 484, 490 (2d Cir.), *cert. denied,* 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991). The first category, an "investigative detention" or *"Terry* stop," *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), employs "the least intrusive means available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983). *A Terry* investigative stop must be based on "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)(quoting *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884–85); *quoted in United States v. Glover,* 957 F.2d 1004, 1008 (2d Cir.1992).

The second category of "seizure" is an arrest, which must be supported by probable cause that a crime has been or is being committed. *United States v. Hooper, supra,* 935 F.2d at 490. Probable cause to arrest exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person arrested. *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949); *United States v. Patrick,* 899 F.2d 169, 171 (2d Cir.1990). Once a lawful arrest is made, the arresting officer does not need a warrant in order to search the person arrested for weapons or for evidence of the suspected crime. *United States v. Robinson,* 414 U.S. 218, 225–26, 94 S.Ct. 467, 472–73, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969).

There are no "bright line" rules for determining whether an encounter with police officers is an arrest requiring probable cause, or an investigatory detention supportable by less than probable cause. *Posr v. Doherty, supra,* 944 F.2d at 98; *see also United States v. Alexander,* 907 F.2d 269, 272 (2d Cir.1990), *cert. denied,* 498 U.S. 1095, 111 S.Ct. 983, 112 L.Ed.2d 1067 (1991). Thus, "an encounter that began as a permissible *Terry* stop may have ripened into an arrest, which must be supported by probable cause, if, for example, the officers unreasonably used means of detention that were more intrusive than necessary." *United States v. Perea,* 986 F.2d 633, 644 (2d Cir.1993). "If the totality of the circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention, the encounter is a full-scale arrest, and the government must establish that the arrest is supported by probable cause." *United States v. Hastamorir,* 881 F.2d 1551, 1556 (11th Cir.1989), *quoted in Posr v. Doherty, supra,* 944 F.2d at 98. Stated another way, "[t]here are … occasions when law enforcement officers do exceed the bounds of permissible safeguards and thereby convert an otherwise legitimate investigative stop into a *de facto* arrest requiring probable cause." *United States v. Alexander, supra; see also United States v. Ceballos,* 654 F.2d 177, 182 (2d Cir.1981)(seizure may be so intrusive as to be tantamount to an arrest).

■ In assessing whether the encounter with police was a *Terry* stop supported by reasonable suspicion, or a *de facto* arrest supported by probable cause, the court should consider the totality of the circumstances, including the following factors:

> [T]he amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, and the physical treatment of the suspect, including whether or not handcuffs were used. . . .

*United States v. Perea, supra,* 986 F.2d at 645 (citations omitted); *see also United States v. Lee,* 916 F.2d 814, 819 (2d Cir.1990).

■ According to the defendant, the decisive factors in this case requiring a finding

that the defendant was arrested were the surrounding of his car by DEA vehicles and the drawing of guns by three officers. *See, e.g., United States v. Marin,* 669 F.2d 73, 81 (2d Cir.1982). In *Marin,* the Second Circuit held that the surrounding of a car, the drawing of guns and the physical removal of the occupant of a vehicle was a *de facto* arrest, requiring probable cause. See also, *United States v. Ceballos,* 654 F.2d 177, 180, 184 (2d Cir.1981). The Second Circuit in *Marin* stated:

> In determining whether a particular restraint is an arrest or tantamount to an arrest, thus requiring probable cause, or instead is a restraint short of an arrest, thus calling for analysis under a reasonableness standard, the degree of restraint must be analyzed. When no formal arrest has been made, several factors must be considered. In particular, courts have considered the amount of force used by the police, the extent of the intrusion, and the extent to which the individual's freedom of movement is restrained. In cases involving stops of cars, we have considered the number of police officers and cars used to effect the stop; whether the police blocked the car in motion or otherwise completely impeded its movement, or whether they merely pulled up near it; and whether the police officers had their guns drawn and in view.

*Marin, supra,* 669 F.2d at 81 (citing *United States v. Ceballos, supra,* 654 F.2d at 180, 184); (other citations omitted).

However, other Second Circuit cases have held that the drawing of guns and the surrounding of the vehicle are not definitive. *See, e.g., United States v. Perea, supra,* 986 F.2d at 644 (blocking of vehicles does not necessarily convert *Terry* stop into a *de facto* arrest); *United States v. Alexander, supra,* 907 F.2d at 273 (drawing of guns is reasonable when target of stop is suspected of drug activity or of being armed). Thus, neither of these factors require a finding of *de facto* arrest in this case. By the same token, *United States v. Bold,* 19 F.3d 99 (2d Cir. 1994), relied on by the government, is not dispositive either. In that case, guns were not drawn and the targets were not forcibly

removed from the car or placed on the ground.

After considering all of the circumstances of this case, I find that the encounter between defendant and the officers did amount to a *de facto* arrest. The uncontroverted testimony at the suppression hearing established that, as soon as defendant pulled his vehicle over to the curb on Genesee Street, he was "boxed in" by police vehicles, street traffic and parked cars (Tr. 30). Investigator Johnson approached defendant's vehicle with his weapon drawn. As he did so, at least two other officers had their weapons drawn and pointed at defendant (Tr. 32–33). There were at least six vehicles containing thirteen law enforcement officers in the immediate vicinity of the stop. When defendant failed to comply with Johnson's directions to exit the vehicle with his hands up, Johnson forcibly removed defendant from his vehicle and placed him face down on the pavement. Although the agents acted reasonably given defendant's resistance in the car and the information they had that he was armed and dangerous, the degree of force used was nevertheless extensive and intrusive. Under these circumstances and giving the defendant the benefit of the doubt, I find that he was arrested and that the arrest must be justified by probable cause.

### 2. *Probable Cause*

█ As the hearing testimony demonstrates, justification for the surveillance, pursuit and seizure of defendant in this case was based almost entirely on the information provided by the confidential informant. Information given by even an untested informant can provide the basis for probable cause when, as in this case, that information is corroborated by the independent observations of the arresting officers. *See United States v. Gaviria,* 805 F.2d 1108, 1115 (2d Cir.1986), *cert. denied,* 481 U.S. 1031, 107 S.Ct. 1960, 95 L.Ed.2d 531 (1987); *see also United States v. Ruiz,* 1994 WL 613294 (S.D.N.Y.); *Draper v. United States,* 358 U.S. 307, 318, 79 S.Ct. 329, 335–36, 3 L.Ed.2d 327 (1959)(after informant told agents that defendant would be returning on a train with heroin in a bag, and agents witnessed person

matching description, probable cause existed to arrest and search defendant), *as reaffirmed by Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 2334, 76 L.Ed.2d 527 (1983);. *United States v. Gonzalez,* 835 F.2d 449, 451 (2d Cir.1987)(probable cause for arrest and search existed after, as predicted by the informant, the defendant met another person and drove to an airport to meet a third person in order to pick up drugs). In addition, an informant who provides information to law enforcement officers face-to-face "must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false." *United States v. Salazar,* 945 F.2d 47, 51 (2d Cir.1991), *cert. denied,* 504 U.S. 923, 112 S.Ct. 1975, 118 L.Ed.2d 574 (1992).

The information provided by the confidential informant in this case was corroborated in several significant respects by the officers' independent observations within a short period of time. The informant provided Detective Rinaldo and Agent Nanna with a detailed description of defendant, his automobile and his residence. Upon arriving at the Meyers Street address, the officers observed a vehicle matching the detailed description provided by the informant. A registration check verified that the vehicle belonged to defendant. The informant also provided information about defendant's connection to Dr. Bird's, which was known by Rinaldo and other officers to be a front for drug activity. This information was further corroborated by Agent Cookfair. The informant also placed a telephone call to defendant at the officers' direction, confirming defendant's presence at the Meyers Street residence. Her detailed description of defendant was corroborated by Agent Gerace when he observed defendant driving the Buick, and by Investigator Johnson when he pulled alongside the vehicle.

In addition, Rinaldo and Nanna were with the informant for almost an hour, giving them ample opportunity to evaluate her demeanor and credibility. As Rinaldo's testimony demonstrated, the informant was articulate and provided detailed and coherent information about defendant's narcotics activities and weapons possession. She repeatedly warned the officers about defendant's dangerous propensities. She was forthcoming about her relationship with defendant and her motivation for providing the information, as well as her own involvement in criminal activity. Thus, her statements to the officers subjected her not only to full accountability for veracity, *see Salazar, supra,* but also to penal risk and personal danger. *See United States v. Willis,* 647 F.2d 54, 59 (9th Cir.1981).

In sum, the information given to the officers by the confidential informant, corroborated to a significant degree by the officers' independent observations, provided sufficient probable cause for them to believe that defendant had recently been or was at the time of the encounter engaged in illegal activity involving narcotics and weapons. Therefore, based on the totality of the facts and circumstances presented by the officers' uncontroverted testimony at the suppression hearing, I find justification for the warrantless seizure of defendant and the resulting search of his person. Having satisfied its burden on the probable cause inquiry, the government has likewise satisfied its burden of demonstrating reasonable suspicion justifying the stop as an investigative detention under *Terry.*

Accordingly, defendant has no basis for challenging the admissibility of the evidence seized as a result of the warrants obtained for the searches of his vehicle, his residence and his safe.

### CONCLUSION

For the foregoing reasons, it is recommended that defendant's motion to suppress **(Items 8 and 14)** be denied.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recom-

mendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. *See, e.g., Paterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al.. v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3). or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order). may result in the District Court's refusal to consider the objection.*

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the government and the defendant.

SO ORDERED.

DATED: Buffalo, New York

Oct. 30, 1996